UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X
THE PORT AUTHORITY POLICE ASIAN
JADE SOCIETY OF NEW YORK & NEW
JERSEY INC., CHRISTIAN ENG,
NICHOLAS YUM, ALAN LEW, HOWARD CHIN,
DAVID LIM, GEORGE MARTINEZ, STANLEY
CHIN, MILTON FONG, RICHARD WONG,
SANRIT BOONCOME AND MICHAEL CHUNG,

                Plaintiffs,           <u>OPINION</u>

     -against-           05 Civ. 3835 (MGC)


THE PORT AUTHORITY OF NEW YORK AND NEW
JERSEY,

                Defendant.
----------------------------------X

APPEARANCES:

        PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
        Attorneys for Plaintiff
        1285 Avenue of the Americas
        New York, New York 10019

        By:  Karen R. King, Esq.
            Susanna M. Buergel, Esq.
            Jane B. O'Brien, Esq.
            Allison Grodin Weiss, Esq.

        THE PORT AUTHORITY OF NEW YORK AND NEW JERSEY
        MILTON H. PACHTER, ESQ.
        Attorney for Defendant
        225 Park Avenue South, 13th Floor
        New York, New York 10003

        By:  Kathleen Gill Miller, Esq.
            Kathleen M. Collins, Esq.
            Caren K. Lee, Esq.

**Cedarbaum, J.**

Plaintiffs sue the Port Authority of New York and New Jersey ("Port Authority") under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-5, for discriminating against Asian-American officers in making promotions to Sergeant. The jury trial began on March 11, 2009, and the jury returned its verdict on March 26, 2009. The Port Authority now moves for judgment as a matter of law, or in the alternative, for a new trial or for a remittitur of the jury's compensatory damages award. For the following reasons, the Port Authority's motion is denied in its entirety.

## BACKGROUND

### I.    The Parties

The Port Authority is a bi-state agency created by compact between the States of New York and New Jersey to develop transportation facilities in the New York metropolitan area. The Port Authority's thirteen facilities are policed by the Port Authority's Public Safety Department.

The plaintiffs are eleven Asian-American members of the Port Authority Public Safety Department. All of the plaintiffs began their careers with the Department as Officers. Christian Eng was hired in 1977, David Lim in 1980, Richard Wong in 1983, Milton Fong in 1985, Howard Chin and Alan Lew in 1987, and

Stanley Chin in 1988.  George Martinez and Nicholas Yum joined in 1993, and both Michael Chung and Sanrit Booncome in 1999.

The Port Authority Police Asian Jade Society of New York and New Jersey ("Asian Jade Society") is a fraternal organization of Port Authority Police officers of Asian or Pacific Islander descent.  Each plaintiff is a member of the Asian Jade Society.

## II.  The Port Authority's Promotion Process

The entry-level rank in the Public Safety Department is Officer.  To be eligible for promotion to Sergeant, a police officer must have served two years as an officer or detective as of the date of the Sergeant's Examination, meet certain attendance requirements, and pass the examination.  Beginning in 1996, all officers who passed were equally eligible for promotion without regard to their score.  Once the exam was scored, a list of officers eligible for promotion was circulated.

The commanding officers of the various facilities were charged with recommending eligible officers for promotion.  Some commanding officers made the recommendations themselves, while others delegated full authority to the officers' direct supervisors.  Still others made the recommendations themselves after receiving advice from the direct supervisors.

The Public Safety Department had no set criteria or protocol for recommendation for promotion. The factors relevant to promotion and the weight assigned to those factors varied among the commanding officers. An officer's supervisor or commanding officer completed a "Performance Appraisal Form" only after selecting that officer to be recommended for promotion. The form required the supervisor to rate the officer on a scale from "unacceptable (clearly below standard)" to "outstanding (among the very best)."

From 1996 to 2001, the next step in the promotion process was the so-called Chiefs' Board, at which the chiefs and deputy chiefs would review the promotion folders of the officers recommended for promotion. During Superintendent Morrone's tenure, no minutes or notes were taken of meetings of the Chiefs' Board. Chief Farrell testified that during that time, the chiefs of each command advocated for the candidates put forth from that command. (Trial Tr. 194, March 13, 2009.) The Chiefs' Board then decided which officers to recommend to the Superintendent, who made the final decision.

Chief Morris assumed the role of Acting Superintendent shortly after Superintendent Morrone was killed on September 11, 2001. Instead of using a Chiefs' Board, he solicited recommendations for promotions from deputy chiefs, who in turn asked the assistant chiefs to collect recommendations from the

4

commanding officers of each facility.  Once the recommendations were made, the assistant chiefs decided among themselves which officers to recommend to the deputy chiefs.  The deputy chiefs then reviewed those and made recommendations to Chief Morris for promotion.

Charles DeRienzo became the Superintendent of Police in April 2002.  He reinstituted a Chiefs' Board comprised of all chiefs and the Acting Superintendent, but excluded himself and Chief Morris.  At these meetings, the chiefs voted after every candidate was discussed.  Officers receiving a majority in favor of promotion were recommended to the Superintendent.  A memorandum listed the officers recommended for promotion and those not recommended with the reason why they were not recommended, and, on occasion, the tally of votes for and against each officer.

Superintendent Plumeri again changed the process when he succeeded Superintendent DiRienzo in 2004.  He did away with the Chiefs' Board and made promotion decisions without formal input from the chiefs.

### III. Procedural History

Before 2001, no Asian-American officer had ever been promoted to Sergeant.  On January 31, 2001 the Asian Jade Society, on behalf of its members, filed a Charge of Discrimination with the Equal Employment Opportunity Commission

5

("EEOC"). The Asian Jade Society received a Right to Sue letter on January 25, 2005. On April 15, 2005, the Asian Jade Society and the individual plaintiffs filed the Complaint in this case. The Complaint alleges that the Port Authority intentionally discriminated against Asian-Americans in making promotions to Sergeant, that the Port Authority had a pattern or practice of intentionally discriminating against Asian-Americans in making promotions to Sergeant, and that the Port Authority's practices for promotion to Sergeant had a disparate impact on Asian-American officers.

After hearing all the evidence, the jury found that the Port Authority's promotion practices for Sergeant had a disparate impact upon Asian-American police officers. The jury also found that the Port Authority had a pattern or practice of intentional discrimination against Asian-American police officers, and that plaintiffs Christian Eng, Milton Fong, Alan Lew, Stanley Chin, Nicholas Yum, George Martinez, and David Lim had been discriminated against as a part of this pattern or practice. In addition, the jury found that the Port Authority's decision not to promote those officers was motivated by their ethnicity.

The jury returned a verdict that Howard Chin, Richard Wong, Michael Chung, and Sanrit Booncome had not proven that they were discriminated against either as part of the Port Authority's

pattern or practice of discrimination or individually. The jury awarded back pay and compensatory damages only to Christian Eng, Milton Fong, Alan Lew, Stanley Chin, Nicholas Yum, George Martinez, and David Lim.

The Port Authority now moves for judgment as a matter of law overturning the jury's verdict for the successful plaintiffs. It also moves in the alternative for a new trial, or a remittitur.

**DISCUSSION**

**IV. The Port Authority's Motions for Judgment as a Matter of Law or a New Trial**

    **A. Standard of Review**

        **1. Rule 50(b) Motion for Judgment as a Matter of Law**

The Port Authority renews its motion for judgment as a matter of law under Fed. R. Civ. P. 50(b). Rule 50(b) permits the jury verdict to be set aside when the jury "would not have a legally sufficient evidentiary basis to find for the [non-moving] party on that issue." Fed. R. Civ. P. 50(a)(1). To grant such a motion, there must be "such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture" or "such an overwhelming amount of evidence in favor of the movant that [a] reasonable and fair minded" jury could not have

returned a verdict in favor of the non-moving party.  Fidelity &
Guaranty Insurance Underwriters, Inc. v. Jasam Realty Corp., 540
F.3d 133, 142 (2d Cir. 2008) (quoting Song v. Ives Labs., Inc.,
957 F.2d 1041, 1046 (2d Cir. 1992)).  When considering a Rule
50(b) motion, all reasonable inferences are drawn in favor of
the non-moving party, evidence may not be weighed or assessed
for credibility.  Reeves v. Sanderson Plumbing Prod., Inc., 530
U.S. 133, 150 (2000).

## 2. Rule 59 Motion for a New Trial

In the alternative, the Port Authority moves for a new
trial under Rule 59(a)(1)(A).  A new trial may be granted when
"the jury has reached a seriously erroneous result" or when the
verdict "is a miscarriage of justice," that is, when the jury
verdict is against the weight of the evidence.  DLC Mgmt. v.
Town of New Hyde Park, 163 F.3d 124, 133-34 (2d Cir. 1998)
(citing Song, 957 F.2d at 1047 and Metromedia v. Fugazy, 983
F.2d 350, 363 (2d Cir. 1992)).  Although evidence may be weighed
and need not be viewed in the light most favorable to the non-
moving party, I should only grant a new trial if I conclude the
jury verdict is "egregious."  DLC Mgmt., 163 F.3d at 134 (citing
Song, 957 F.2d at 1047)).

## B. Analysis

### 1. Statute of Limitations

At trial, the jury was permitted to consider events prior to August 2, 2000 (180 days prior to the filing of the EEOC charge) for two distinct purposes. First, those events could be considered as evidence bearing on whether the Port Authority made a discriminatory decision not to promote a particular plaintiff after August 2, 2000. Second, under the "continuing violations" doctrine, the jury was permitted to consider whether events that occurred before August 2, 2000 could give rise to liability if they were part of an "ongoing policy of discrimination" that persisted into the limitations period, that is, after August 2, 2000.

#### a. Introduction of Evidence that Arose Before August 2, 2000.

The Port Authority first argues that the use of events prior to August 2, 2000 as background evidence for indisputably timely claims was error that requires a new trial. At the outset, this argument confuses the limitations period on a claim with the admissibility of evidence relating to that claim. Otherwise admissible evidence does not become inadmissible if the statute of limitations would have run on a claim that arose on that date. As the Supreme Court commented in <u>Nat'l R.R. Passenger Corp. v. Morgan</u>, 536 U.S. 101, 113 (2002), the statute

of limitations does not "bar an employee from using . . . prior acts as background evidence in support of a timely claim." Moreover, it is reversible error to preclude otherwise admissible evidence solely because it dated to a time when a claim would have been time-barred. <u>Jute v. Hamilton Sundstrand</u>, 420 F.3d 166, 175 (2d Cir. 2005). Evidence from a truly remote period may be precluded under Fed. R. Evid. 403 but only because its probative value is attenuated by the passage of time. The Port Authority's argument that I erred by permitting the jury to consider events that occurred before August 2, 2000 as background evidence for timely claims is therefore without merit.

### b. Substantive Claims

The Port Authority's second argument is that the verdict cannot stand because the jury was permitted to consider liability for events before August 2, 2000 for the plaintiffs' pattern and practice and disparate impact claims.

### i. The Limitations Period for Title VII Claims

Title VII prohibits certain "employment practices." 42 U.S.C. §§ 2000e-2(a). To preserve a claim, a plaintiff must file an EEOC charge within 180 or 300 days after the complained-of practice "occurred." 42 U.S.C. § 2000e-5(c). In

determining the timeliness of a Title VII claim two interrelated questions must be considered: "what [is the] 'unlawful employment practice'" at issue, and "when has that practice 'occurred.'"  Morgan, 536 U.S. at 110.  As the Supreme Court noted in Morgan, the timeliness of any claim "varies with the practice."  Id.

At one end of the spectrum, certain practices are "discrete acts" that occur at a particular moment in time.  Id., at 114. Almost by definition, an untimely claim based upon them cannot become timely simply because that claim is related to a timely claim based on another discrete act.  Id., at 113.

On the other end, certain practices are "continuing violations."  These claims are based on an "ongoing policy of discrimination," that is, a single unlawful employment practice comprised of events extended over time.  Because such a claim encompasses the entire unlawful employment practice, events outside the statutory period may give rise to liability.  Id., at 118.

The plaintiffs' individual disparate treatment claims are examples of "discrete act[s]."  Each claim is based on a particular, isolated decision (or decisions) not to promote a plaintiff motivated by ethnicity.  Thus, the jury was instructed that it could only find the Port Authority liable if the

decision (or decisions) in question had been made after August 2, 2000. (Trial Tr. 1307, March 24, 2009; Verdict Form, Part Three, pp. 5-7.)[1]

The Port Authority proffers two – largely interrelated –reasons why the plaintiffs' disparate impact and pattern or practice disparate treatment claims are not continuing violations. First, it contends the "continuing violations" doctrine is inapplicable because the plaintiffs failed to identify a discriminatory policy. Second, it asserts that Morgan limits the "continuing violations" doctrine to hostile work environment claims, and requires discriminatory policies to be analyzed as "discrete acts."

### ii. The plaintiffs' disparate impact and pattern or practice claims properly challenged a discriminatory policy.

The plaintiffs' disparate impact and pattern or practice claims each charged that the Port Authority's practices for promotion to Sergeant discriminated against Asian-American police officers. Because the unlawful employment practice at issue was an "ongoing discriminatory policy," each claim is a "continuing violation," not a discrete act.

---

[1] The jury's verdict that plaintiffs Eng, Fong, Stanley Chin, Lew, Martinez, Yum, and Lim were each discriminated against after August 2, 2000 was by itself sufficient for the jury to award each of them back pay and compensatory damages.

A disparate impact claim challenges an employment practice
that causes  an imbalance in opportunities among protected
groups.  42 U.S.C. § 2000e-2(k)(1)(A)(i) (to make out a prima
facie case, a plaintiff must show that the employer "uses a
particular employment practice that causes a disparate impact");
Gulino v. New York State Dept. of Ed., 460 F.3d 361, 382 (2d
Cir. 2006) (quoting New York City Tran. Auth. v. Beazer, 440
U.S. 568, 584 (1979) (defining "disparate impact" as when "an
employment practice has the effect of denying the members of one
race equal access to employment opportunities."))  To press a
disparate impact claim, the plaintiffs must identify a
particular employment practice.  In this case, the plaintiffs
identified the Port Authority's practices for promotion to
sergeant.  Although the Port Authority's practices were
occasionally altered during the relevant period, the overall
policy was continuously maintained from 1996 until at least
August 2, 2000.

The Port Authority makes the subsidiary argument that the
plaintiffs failed to identify which element of the Port
Authority's promotion practices caused a discriminatory impact.
While § 2000e-2(k)(b)(i) provides that a plaintiff must
demonstrate that each challenged practice causes a disparate
impact, that subsection goes on to provide that "if the
complaining party can demonstrate to the court that the elements

of a respondent's decisionmaking process are not capable of separation for analysis, the decisionmaking process may be analyzed as one employment practice." Id. See also Malave v. Potter, 320 F.3d 321, 327 (2d Cir. 2003) (quoting § 2000e-2(k)(b)(i)..

The Port Authority's process for making promotions from the list of eligible officers was comprised of several steps. But these steps cannot be separately analyzed both because records do not exist for every step and because the causal role of each step is called into doubt by the records that do exist. For example, Superintendent DeRienzo testified that he could not recall ever having promoted someone not recommended by the Chiefs' Board. (Trial Tr. 261-62, March 13, 2009.) At a Chiefs' Board in 2003 during his tenure, Plaintiff Nicholas Yum received a unanimous vote in favor of promotion. (Pls.' Ex. 18.) At another Chiefs' Board on January 7, 2003, Peter Hernandez was given a "No" recommendation, with five votes against, three for, and the notation "Sick History Record." (Pls.' Ex. 17.) Steven Grossi's vote stalemated at the January 7, 2003 Chiefs' Board. (Id.) Grossi and Hernandez were promoted on January 24, 2003; Nicholas Yum was not promoted until October 2005. (Pls.' Ex. 28.) In sum, for many of the plaintiffs, all that could be shown is whether they were recommended and that they were ultimately not promoted.

Because the role of each step cannot be determined, the steps cannot be examined separately to discover whether a particular step causes a disparate impact. The jury was instructed to consider whether the decision making process as a whole caused a disparate impact if the steps of the process could not be separated for analysis. (Trial Tr. 1304, March 24, 2009.) Therefore, the Port Authority's practices for promotion to Sergeant are properly analyzed as a continuously maintained discriminatory policy that caused a disparate impact on Asian-American police officers.

A pattern or practice claim is a means of challenging a persistent "unlawful employment practice," that is, an enduring policy or custom of intentional discrimination. See Robinson, 267 F.3d at 160 (citing Int'l. Bhd. of Teamsters v. United States, 431 U.S. 324, 336 (1977)). Pattern or practice claims are defined in opposition to "discrete acts"; a pattern or practice can only be found when the practice is of such a "routine, or of a generalized nature" that it is the defendant's "standard operating procedure." Int'l Bhd. of Teamsters, 431 U.S. at 336, n. 16; Robinson, 267 F.3d at 160. The Port Authority now argues that the plaintiffs failed to identify a specific discriminatory policy or general practice of discrimination. This is incorrect. The plaintiffs consistently argued that intentional discrimination was so pervasive in the

15

Port Authority's practices for promotion to sergeant that it amounted to a discriminatory policy or custom. This is a sufficient identification to proceed on a pattern or practice theory. Cf., Hazelwood School Dist. v. U.S., 433 U.S. 299, 303 (1977) (attorney general's "pattern or practice" suit identified "standardless and highly subjective" hiring practices); Robinson, 267 F.3d at 154 (company-wide policy of delegating discipline and promotion procedures to supervisors allegedly resulted in a pattern or practice of intentional discrimination.) Thus, the plaintiffs' pattern or practice claim properly challenged a discriminatory policy or custom.

> **iii. Title VII claims that challenge a discriminatory policy are analyzed as "continuing violations."**

Next, the Port Authority argues that Morgan limits the "continuing violations" doctrine to claims involving a hostile work environment and therefore, both the plaintiffs' disparate impact and "pattern or practice" claims must be analyzed as "discrete acts."

The Second Circuit developed the "continuing violations" doctrine to address the problem of longstanding discriminatory policies and customs. In a series of cases, the Court of Appeals rejected the argument that only plaintiffs to whom the

policy was applied within the limitations period could sue. Instead, the Court of Appeals held that "a continuously maintained illegal employment policy may be the subject of a valid complaint until a specified number of days after the last occurrence of an instance of that policy" and "all plaintiffs injured by . . . adherence to that policy are therefore entitled to relief." Acha v. Beame, 570 F.2d 57, 65 (2d Cir. 1978); The Guardians Association of the New York City Police Department et al v. Civil Service Commission (Guardians III), 633 F.2d 232, 251 (2d Cir 1980) (citing Acha, 570 F.2d at 65)). See also Association Against Discrimination v. Bridgeport, 647 F.2d at 274; Lambert v. Genesee Hospital, 10 F.3d 46, 53 (2d Cir. 1993) (citing Association Against Discrimination v. Bridgeport, 647 F.2d at 274)).

The Port Authority argues that the Supreme Court's holding in Morgan restricts the Second Circuit's continuing violations doctrine to cases involving a hostile work environment. In support, the Port Authority points to the Supreme Court's statement in Morgan that "discrete acts such as termination, failure to promote, denial of transfer . . . are easy to identify" and that Title VII "precludes recovery for discrete acts . . . that occur outside the statutory time period." Morgan, 536 U.S. at 105, 114. From this, the Port Authority

concludes that any unlawful employment practice touching on one of these acts (e.g. promotion, e.g.) is a "discrete act."

But that is not the holding of Morgan.  Morgan did not involve a "pattern-or-practice" claim, or any claim, other than that of a hostile work environment, which would be a proper "continuing violation" under the Second Circuit's doctrine.  The "continuing violation" at issue in Morgan was analyzed under the Ninth Circuit's "serial violation" theory, which permits a series of "related acts" to be treated as a single "continuing violation."  Morgan, 536 U.S. at 107.  The Supreme Court held that a series of related but ultimately discrete acts could not be treated as a single unlawful employment practice.  Id., at 114.  This is in keeping with the Second Circuit's pre-Morgan precedent.  Compare Lambert v. Genesee Hospital, 10 F.3d 46, 53 (2d Cir. 1993) (multiple similar instances of discrimination cannot form a continuing violation unless they stem from a discriminatory policy or mechanism) with Morgan v. National Railroad Passenger Corporation, 232 F.3d 1008, 1015 (9th Cir. 2000) (a continuing violation may be shown by a "series of related acts").

The contrast Morgan drew was between "discrete acts" on the one hand and ongoing unlawful employment practices, which includes a hostile work environment, on the other.  A hostile work environment, the Morgan court noted, "cannot be said to

occur on any particular day" and is based on the "cumulative effect of individual acts." Id., at 116. Each act that contributed to that environment "encompas[ses] a single unlawful employment practice." Thus, a hostile work environment claim is timely as long as it is filed within 180 or 300 days of an act that was part of that hostile work environment. Id., at 118.

The continuing violations at issue in this case demand an analysis analogous to Morgan's treatment of a hostile work environment. Every act that was part of those discriminatory policies was part of a single, ongoing unlawful employment practice that did "not occur on any particular day." In a recent § 1983 case, the Second Circuit relied on Morgan for the proposition that the "continuing violation doctrine can be applied when the plaintiff seeks redress for injuries resulting from 'a series of separate acts that collectively constitute one 'unlawful act . . .''" Shomo v. City of New York, No. 07-1208-cv, 2009 U.S. App. LEXIS 23076 (2d Cir. August 13, 2009). Because the plaintiffs' disparate impact and pattern or practice claims each challenged a single, ongoing unlawful employment practice, the jury was properly permitted to consider acts 180 days or more before the filing of the EEOC charge under the "continuing violations" doctrine.

## 2. Dr. Cavanaugh's Testimony

The plaintiffs offered the testimony of Dr. Cavanaugh, a statistical expert. The Port Authority now argues that his testimony was inadmissible and a new trial is required to correct this error. At the outset, I note that the Port Authority did not move _in limine_ to preclude Dr. Cavanaugh's testimony, and that the trial transcript reveals no clear objection to his testimony under Rule 702. Failure to make an objection either _in limine_ or at trial ordinarily constitutes waiver. See United States v. Yu-Leung, 51 F.3d 1116, 1121 (2d Cir. 1995); see also Fed. R. Evid. 103.

In any event, the Port Authority's argument addresses the weight of Dr. Cavanaugh's testimony, not it admissibility. Under Rule 702, as interpreted by the Supreme Court in Daubert v. Merrell Dow Pharma., 509 U.S. 579 (1993), and its progeny, expert testimony that will assist the jury in understanding the facts at issue is admissible if the expert uses reliable methods and properly applies them to the facts in the case at hand. The Port Authority's principal objection to Dr. Cavanaugh's testimony is that his analyses did not consistently show statistical significance at the 5% level.[2] It is correct that statistical significance at the 5% level is generally

_____

[2] Put otherwise, some of Dr. Cavanaugh's analyses showed that the observed distribution would occur by chance more than 5% of the time.

"sufficient to warrant an inference of discrimination." <u>Smith</u>
<u>v. Xerox Corp.</u>, 196 F.3d 358, 366 (2d Cir. 1999).  But evidence
is not inadmissible because it does not itself make out a prima
facie case for its proponent.  Dr. Cavanaugh presented the
results of his analyses to the jury and then explained why, in
his opinion, they were significant given the sample size at
issue.  The Port Authority had a full opportunity to cross-
examine Dr. Cavanaugh.  Its own expert, Dr. Zellner, disagreed
with Dr. Cavanaugh's choice of groups for comparison, but did
not "have any concerns" about his choice of statistical methods
or his application of those methods to that data set.  (Trial
Tr. 986, March 19, 2009).  My role is to act as a gatekeeper,
and permit evidence that uses accepted statistical methods
properly applied to the facts of the case.  It is the jury's
role to decide between competing conclusions based on the data
and analysis.  Therefore, the admission of Dr. Cavanaugh's
testimony does not warrant a new trial.

### 3. The Jury Verdict and the Verdict Form

#### a. The Jury Verdict

As noted above, the jury returned a verdict in favor of the
Port Authority on the "pattern or practice" claims of plaintiffs
Howard Chin, Wong, Chung, and Booncome, and awarded those
plaintiffs no damages.  The Port Authority asserts that the jury
verdict is inconsistent and thus merits a new trial.  A jury

verdict may be set aside for inconsistency only if it is "ineluctably inconsistent," that is, when there is no rational means of harmonizing the jury's answers.  <u>Munafo v. Metropolitan Transportation Authority</u>, 381 F.3d 99, 105 (2d Cir. 2004).

The first alleged inconsistency is that the jury's finding that the Port Authority's promotion practices for Sergeant had a disparate impact upon Asian-American police officers is inconsistent with the jury's decision not to award any back pay to Howard Chin.  The jury was free to conclude that Howard Chin would not have been promoted even absent the disparate impact and therefore was not entitled to back pay.  <u>See</u> <u>EEOC v. Joint Apprenticeship Committee</u>, 186 F.3d 110, 122-23 (2d Cir. 1998).  The Port Authority also attempts to cast the jury's "pattern or practice" verdict as inconsistent because the jury did not return a verdict for every plaintiff on that claim.  This is not inconsistent.  Each of the eleven plaintiffs was required to prove, by a preponderance of the credible evidence, that he was discriminated against as part of that pattern or practice.  The fact that the jury found that several plaintiffs had not met that burden does not render the verdict inconsistent.  Because the jury verdict can be harmonized rationally, it cannot be overturned as inconsistent.

### b. Verdict Form

The Port Authority argues that a new trial is required because the jury failed to understand the verdict sheet and was "confused as to whether this was a class action." (Def.'s Mem. at 28.) There is simply no reason to believe that the jury was confused about whether the action was a class action. The jury answered separate questions and evaluated damages separately for each plaintiff. Second, it is understandable that the jury would seek further guidance about the meaning of the complex questions this case presented. The fact the jury asked for clarification does not suggest that the jury failed to understand the verdict sheet. Finally, my instruction that the jury was required to find disparate impact after August 2, 2000 in order to return a verdict for the plaintiffs on that claim accurately states the law and did not "direct a verdict against the Port Authority."

### c. The Jury's Back Pay Award

The Port Authority maintains that the jury's back pay award must be vacated because it awarded back pay beginning as early as October 31, 1999. 42 U.S.C. § 2000e-5(g)(1) provides that back pay cannot be awarded from a date earlier than two years prior to the filing of a charge with the EEOC. The plaintiffs' EEOC charge was filed on January 31, 2001. Two years prior to that date is January 31, 1999. The jury's back pay award for three plaintiffs exactly matches the back pay plaintiffs' expert

calculated would be due had those plaintiffs been promoted on
October 31, 1999.  October 31, 1999 is within the two-year
statutory period.  The Port Authority's argument that back pay
cannot be awarded from a time more than 180 days before the
filing of the EEOC charge in effect reargues the statute of
limitations issue that I addressed above.

### 4. Sufficiency and Weight of the Evidence

The Port Authority also moves for judgment as a matter of
law on the ground that the jury lacked a legally sufficient
evidentiary basis to return its verdict on the plaintiffs'
disparate impact and pattern or practice claims, or for a new
trial on those claims on the ground that the verdict is against
the weight of the evidence.

The main thrust of the Port Authority's argument is that
the statistical evidence presented by plaintiffs' expert, Dr.
Cavanaugh, was insufficient to support the jury's findings of
disparate impact and a pattern or practice of intentional
discrimination.  As the Port Authority points out, statistical
significance at the 5% level is generally "sufficient to warrant
an inference of discrimination."  Smith, 196 F.3d at 366; see
also Ottaviani v. State University of New York at New Paltz, 875
F.2d 365, 371 (2d Cir. 1989) (significance at 5% level supports
an inference of discrimination); Waisome v. Port Authority, 948
F.2d 1370, 1376 (statistical disparity of "two or three standard

deviations . . . is generally highly probative of discriminatory treatment"). That said, the Court of Appeals has cautioned that "where statistics are based on a relatively small number of occurrences, the presence or absence of statistical significance is not a reliable indicator of disparate impact." Waisome, 948 F.2d at 1379. In such an instance, "other indicia raising an inference of discrimination must be examined." Id. See also International Brotherhood of Teamsters v. T.I.M.E., Inc., 431 U.S. 324, 340 (1977) (warning that "[the usefulness of] statistics depends on all of the surrounding facts and circumstances").

At trial, Dr. Cavanaugh presented an analysis comparing the promotion rates of eligible Asian-American officers with that of eligible White officers. Dr. Cavanaugh used the Fisher Exact Test to calculate the likelihood of observing the promotion rates between the two groups under the hypothesis that the observed distribution is due to chance.[3] Dr. Cavanaugh determined that between August 1996 and January 31, 2001, the Fisher Exact Test returned a p-value of 13%. (Trial Tr. p. 729, March 17, 2009) According to Dr. Cavanaugh, this means that there is an approximately 13% likelihood of observing by chance the given distribution of Asian-American officers promoted (zero

_____

[3] See generally, R.M. Fisher, On The Interpretation of [Chi-Squared] from Contingency Tables, and the Calculation of P, 85 J. Royal Stat. Soc'y 87 (1922).

out of twelve) and White officers promoted (36 of 259). (<u>Id.</u>)
On cross-examination, Dr. Cavanaugh stated that although his
results were not significant at the 5% level, he believed that
those results were significant because the small sample size
made it impossible to provide statistical evidence at the 5%
level "even with perfect discrimination." (Trial Tr. at 754-55,
March 18, 2009.)[4]

The Port Authority's statistical expert, Dr. Zellner, also
used the Fisher Exact Test, but instead compared the number of
Asian-American officers promoted from all Asian-American
officers on eligible lists between August 9, 1996 and April 15,
2005, with the number of all other officers promoted from all
other eligible officers during that time period. She concluded
that the Fisher Exact Test returned a p-value of 38.5% for that
data set, suggesting an over one-in-three chance that the given
distribution would be observed due to chance. (Trial Tr. 954-
960, March 19, 2009)

The statistical evidence was not sufficient to either prove
or disprove the plaintiffs' claim, and so the jury considered
other evidence of discrimination. <u>See</u> <u>Waisome</u>, 948 F.3d at 1379.
Each plaintiff testified about his qualifications, service

---

[4] The Port Authority argues that Dr. Cavanaugh "did not take into
account the small number of Asian police officers in the entire force." The
factual basis of this argument is unclear given Dr. Cavanaugh's testimony
and the fact that the Fisher Exact Test uses number of officers in each
category to calculate the p-value, reflecting the small number of Asian-
American officers eligible for promotion.

record, awards, commendations, and achievements, and the Port Authority had an opportunity to cross-examine each plaintiff.

The plaintiffs presented evidence that the Port Authority's promotion process lacked clear standards and guidelines, and that non-Asian-American officers who may have been less-qualified were promoted, sometimes even after one of the plaintiffs had been recommended for promotion by the Chiefs' Board. The jury deliberated for several days and made a number of requests to review the evidence presented at trial. The jury verdict reflects careful attention to whether each plaintiff had proven his individual claim. Ultimately, I cannot conclude that the verdict could "only have been a result of sheer surmise and conjecture" or that the evidence was so overwhelmingly in favor of the Port Authority that a "reasonable and fair minded" jury could not have returned its verdict. Fid. & Guar. Ins. Underwriters, 540 F.3d at 142.

Although I may weigh evidence and draw inferences against the plaintiffs when considering the Port Authority's motion for a new trial, I am satisfied that the jury's verdict is not so erroneous or so contrary to the evidence as to constitute a "miscarriage of justice." DLC Mgmt., 163 F.3d 133-34.

## II. Remittitur

The Port Authority asks that I remit the jury's compensatory damages award to plaintiffs Christian Eng and David

Lim from $250,000 to $50,000; from $100,000 to $25,000 for
plaintiffs Milton Fong and Stanley Chin; and for plaintiff Alan
Lew from $75,000 to $20,000. Remittitur permits me to put the
plaintiffs to a choice between accepting a reduction in the
damages awarded or a new trial. Earl v. Bouchard Transp., 917
F.2d 1320, 1328 (2d Cir. 1990). When federal law provides the
cause of action, remittitur is appropriate when the jury award
includes an identifiable error of a quantifiable amount or is so
high as to "shock the conscience." Kirsh v. Fleet Street, Ltd.,
148 F.3d 149, 165 (2d Cir. 1998) (quoting O'Neill v.
Krzeminski, 839 F.2d 9, 13 (2d Cir. 1988)). In the Second
Circuit, the preferred method of calculating a remittitur is to
reduce an excessive award to the maximum amount that I would
sustain as not excessive. Martinez v. Port Authority, 445 F.3d
158, 160 (2d Cir. 2006) (citing Earl, 917 F.2d at 1330)).
Comparison to similar cases can help illuminate whether an award
is unconscionably high, but the award in a particular case must
be seen in light of the facts and circumstances of that case.
As a result, it is difficult to discern a consistent practice,
notwithstanding the formula that "garden variety" emotional
distress claims merit an award between $30,000 and $100,000.
See, e.g, Lynch v. Town of Southampton, 492 F. Supp. 2d 197, 207
(E.D.N.Y. 2007) (quoting Watson v. E.S. Sutton, Inc., 02 CV
2739, 2005 U.S. Dist. LEXIS 31578 (S.D.N.Y. Sept. 6, 2005)).

28

In certain cases, other judges of this District and of the Eastern District have upheld compensatory damage awards in excess of the $250,000 award to Christian Eng and David Lim, or remitted larger awards to a still substantial amount. See, e.g., Osorio v. Source Enter's., No. 05 Civ. 10029 (JSR), 2007 U.S. Dist. LEXIS 18725 (S.D.N.Y. March 5, 2007) (upholding a $4 million compensatory damages award in a Title VII and state-law retaliation case); Marchisotto v. City of New York, No. 05 Civ. 2699 (RLE), 2007 U.S. Dist LEXIS 27046, at *37-38 (S.D.N.Y. April 11, 2007) (upholding $300,000 compensatory damages award for retaliation); Quinn v. Nassau County Police Dep't., 53 F. Supp. 2d 347 (E.D.N.Y. 1999) ($250,000 compensatory damages award for protracted harassment did not shock the conscience); Quinby v. WestLB AG, No. 04 Civ. 7406 (WHP), 2008 U.S. Dist. LEXIS 62366 (S.D.N.Y. August 15, 2008) (remitting a compensatory damages award of $500,000 for "garden variety emotional distress" to $300,000.)

The Port Authority cites Patrolmen's Benevolent Ass'n v. City of New York, 315 F.3d 43, 55 (2d Cir. 2002) for the proposition that an award for emotional damages must be supported by "competent evidence" in addition to the plaintiffs' testimony. As that case goes on to hold, "competent evidence" is not limited to medical evidence; the award should be considered in light of the "circumstances of the violation

itself." Id.  The compensatory damages awarded to Christian Eng and David Lim are extremely large.  But, I do not conclude that they "shock the judicial conscience."

## CONCLUSION

For the foregoing reasons, the Port Authority's motion is denied in its entirety.

SO ORDERED.


Date:    New York, New York
         January 13, 2010


                    S/_____
                         MIRIAM GOLDMAN CEDARBAUM
                         United States District Judge